**Case Nos. 07-7757 (CM) and 07-7941 (CM)**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

*In re:* ENRON CREDITORS RECOVERY CORP., f/k/a Enron Corp., *et al.*,

*Debtors.*

---

JPMORGAN CHASE BANK, N.A., CREDIT SUISSE FIRST BOSTON, DEUTSCHEBANK TRUST COMPANY AMERICAS, FARALLON CAPITAL MANAGEMENT, LLC, KING STREET CAPITAL L.P., REDWOOD PARTNERS, SILVER POINT CAPITAL L.P.,

*Appellants,*

–against–

THE BAUPOST GROUP, LLC, ABRAMS CAPITAL, LLC, ENRON CREDITORS RECOVERY CORP., f/k/a Enron Corp., *et al.*,

*Appellees.*

---

*Appeal from the United States Bankruptcy Court for the Southern District of New York, Case No. 01-16034 (Jointly Administered)*

---

### APPELLANTS' OPENING BRIEF

---

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of Americas
New York, New York 10036
(212) 715-9100
P. Bradley O'Neill, Esq.
Amy Caton, Esq.
Daniel M. Eggermann, Esq.

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800
Sarah Reid, Esq.
Alison L. MacGregor, Esq.

*Counsel for Appellants JPMorgan Chase Bank, N.A. and Choctaw/Zephyrus Appellants*

*Counsel for Appellants JPMorgan Chase Bank N.A.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF JURISDICTION.....................................................................................1

STATEMENT OF ISSUES ON APPEAL ...........................................................................1

STANDARD OF REVIEW .................................................................................................2

PRELIMINARY STATEMENT .........................................................................................2

STATEMENT OF THE CASE.............................................................................................5

    The TOPRS Indentures .................................................................................................5

    The 1987 Indenture .......................................................................................................6

    Appellants' Relevant Schedule S Claims .....................................................................7

    The Composition of Schedule S and the Resulting Litigation......................................9

    The Bankruptcy Court's Decision ..............................................................................10

    The Motion for Clarification and the Order Further Amending Schedule S ...............13

ARGUMENT .....................................................................................................................13

    I.       Standards for Contract Interpretation....................................................................13

    II.      The Bankruptcy Court Erred When it Concluded that the Cherokee and EFP
          Claims Were Not Senior Indebtedness Under the TOPRS Indentures ...................14

          A.      The Bankruptcy Court Misapplied the Rule of the Last Antecedent........15

          B.      The Plain Meaning of the Bankruptcy Court's Interpretation Would
                Lead to Absurd or Unusual Results ..........................................................18

    III.     The 1987 Indenture Unambiguously Provides that the EFP Claims Constitute
          "Senior Indebtedness"..........................................................................................20

          A.      Enron and/or its Affiliates Did Not Own All of the Voting Shares
                of EFP Upon the Relevant Occurrence of a Subordination Event.............20

          B.      The EFP Claims Were Not Held by a "Subsidiary" Because EFP
                Was Not a "Corporation" for Purposes of the 1987 Indenture .................24

CONCLUSION...................................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

<u>Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.</u>, No. 04-10014,
      2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005)............................................................. 13-14

<u>Barnhart v. Thomas</u>, 540 U.S. 20, 124 S. Ct. 376 (2003)............................................... 15-17

<u>Bischoff v. Boar's Head Provisions Co.</u>, 436 F. Supp. 2d 626 (S.D.N.Y. 2006) ...........24

<u>In re Enron Creditors Recovery Corp.</u>, 370 B.R. 64 (Bankr. S.D.N.Y. 2007) ..................... *passim*

<u>Federal Trade Commission v. Mandel Bros. Inc.</u>, 359 U.S. 385, 79 S. Ct. 818 (1959) ...............16

<u>Goodheart Clothing Co. v. Laura Goodman Enters., Inc.</u>, 962 F.2d 268 (2d Cir. 1992)................2

<u>Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, No. 96-7874,
      2002 WL 31106406 (S.D.N.Y. Sept. 20, 2002)................................................... 14, 18-19

<u>In re ICLNDS Notes Acquisition, LLC</u>, 259 B.R. 289 (Bankr. N.D. Ohio 2001)........................24

<u>Lattanzio v. Comm. on Massage Therapy Accreditation</u>, 481 F.3d 137 (2d Cir. 2007) ...............24

<u>Lee v. BSB Greenwich Mortgage Ltd. P'ship</u>, 267 F.3d 172 (2d Cir. 2001) ..................................2

<u>Metro. Life Ins. Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884 (2d Cir. 1990) ......................................13

<u>Natwest USA Credit Corp. v. Alco Standard Corp.</u>, 858 F. Supp. 401 (S.D.N.Y. 1994) .......14, 18

<u>Rubens v. Mason</u>, 387 F.3d 183 (2d Cir. 2004).............................................................................2

<u>Silinsky v. State-Wide Ins. Co.</u>, 289 N.Y.S.2d 541 (N.Y. App. Div. 1968)...........................14, 18

<u>Sumitomo Trust & Banking Co. v. Holly's Inc. (In re Holly's Inc.)</u>,
      140 B.R. 643 (Bankr. W.D. Mich. 1992)..............................................................................21

<u>Tzolis v. Wolff</u>, 829 N.Y.S.2d 488 (N.Y. App. Div. 2007)...........................................................24

<u>United States v. Kerley</u>, 416 F.3d 176 (2d Cir. 2005) ..................................................................15

<u>United States v. Martin</u>, 438 F.3d 621 (6th Cir. 2006) ..................................................................17

<u>UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.</u>, 793 F. Supp. 448 (S.D.N.Y. 1992) ................23

<u>Vt. Teddy Bear Co. v. 538 Madison Realty Co.</u>, 807 N.E.2d 876,
      775 N.Y.S.2d 765 (N.Y. 2004) ............................................................................................14

<u>Statutes</u>

N.Y. CLS LLC § 102(m) ..............................................................................................................25

Tex. Rev. Civ. Stat. art. 1528n, Art. 2.02 ....................................................................................24

<u>Other Sources</u>

<u>Black's Law Dictionary</u> (8th ed. 2004)..........................................................................................18

Charles J. Woelfel, Encyclopedia of Banking and Finance, (10th ed. 1994) ...............................19

Dee Martin Calligar, Subordination Agreements, 70 Yale L.J. 376 (1960) .................................22

JPMorgan Chase Bank, N.A. ("JPMC"), as agent with respect to certain financing transactions commonly referred to as the Choctaw and Zephyrus transactions (the "Choctaw/Zephyrus Transactions"), and certain holders of claims arising out of the Choctaw and Zephyrus Transactions (the "Choctaw/Zephyrus Appellants"[1] and together with JPMC, the "Appellants"), respectfully submit this memorandum of law in support of their appeal from the order dated July 24, 2007 (the "Order") of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") sustaining in part and overruling in part the limited objection (the "Objection") of the Appellees The Baupost Group, LLC and Abrams Capital, LLC (together, "Baupost/Abrams" or the "Appellees") to the approval of Amended Schedule S to the Debtors' plan of reorganization.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal from a final bankruptcy court order pursuant to 28 U.S.C. § 158(a)(1) and subject matter jurisdiction under 28 U.S.C. § 1334(b).

## STATEMENT OF ISSUES ON APPEAL

1.    Whether the Bankruptcy Court erred when it failed to apply a well-settled rule of contract interpretation (i.e., the rule of the last antecedent) in accordance with two unanimous holdings of the United States Supreme Court, thereby disregarding the plain meaning of the TOPRS Indentures[2] when it held that the TOPRS Indentures' definition of "Senior Indebtedness" only includes notes (and guarantees of notes) that were "sold," and does not include notes (and guarantees of notes) that were "issued."

---

[1]    The Choctaw/Zephyrus Appellants are: Credit Suisse First Boston, Deutschebank Trust Company Americas, Farallon Capital Management, LLC, King Street Capital L.P., Redwood Partners and Silver Point Capital, L.P., on behalf of themselves and/or funds and accounts managed or controlled by them.

[2]    Capitalized terms used in the Statement of Issues on Appeal and Preliminary Statement are defined elsewhere herein.

1

2.      Whether the Bankruptcy Court erred when it concluded that the subordination obligations under the 1987 Indenture arose only upon distribution, thereby excluding the EFP Claims from the definition of "Senior Indebtedness" under the 1987 Indenture, even though the 1987 Indenture clearly specifies that the subordination obligation arises upon an event of default, at which time Enron indisputably did <u>not</u> hold 100% of the voting shares of EFP and therefore was not a "Subsidiary" as defined in the 1987 Indenture.

3.      Whether the Bankruptcy Court erred when it concluded that EFP, a limited liability company, was a "corporation" for purposes of the 1987 Indenture and therefore a "Subsidiary," where the definition of "corporation" does not expressly include limited liability companies.

## STANDARD OF REVIEW

This appeal turns on issues of contract interpretation that are issues of law subject to *de novo* review by this Court.  <u>See</u>, <u>e.g.</u>, <u>Rubens v. Mason</u>, 387 F.3d 183, 188 (2d Cir. 2004) (proper standard of review for issues of contract interpretation is *de novo*); <u>Lee v. BSB Greenwich Mortgage Ltd. P'ship</u>, 267 F.3d 172, 178 (2d Cir. 2001) (same); <u>Goodheart Clothing Co. v. Laura Goodman Enters., Inc.</u>, 962 F.2d 268, 273 (2d Cir. 1992).

## PRELIMINARY STATEMENT

In the years prior to its bankruptcy filing, Enron Corp. ("Enron") issued approximately $1 billion of "subordinated" debt under several indentures (the "Subordinated Indentures").  Under the terms of the various Subordinated Indentures, the subordinated debtholders agreed that, in the event of a default by Enron in the payment of "senior" debt, they would not be entitled to payment on their debt.  Instead, all of the monies that would otherwise be paid to the subordinated debtholders would be paid to holders of senior debt until the senior

debt was paid in full.  Each of the Subordinated Indentures contains its own definition of what constitutes "Senior Indebtedness."

As required by Section 510(a) of the Bankruptcy Code, Enron's plan of reorganization sought to enforce the subordination provisions in the Subordinated Indentures.  In particular, Schedule S (contained in a supplement to Enron's Plan) listed the categories of claims that qualified as "Senior Indebtedness" entitled to the benefits of subordination under the Subordinated Indentures.  Following the Debtors' final submission of Schedule S, two holders of senior claims on Schedule S – The Baupost Group and Abrams Capital – objected to the inclusion of a number of other "senior" claims on that schedule.[3]

On May 29, 2007, the Bankruptcy Court issued a memorandum decision (the "Opinion") upholding certain of Baupost/Abrams' objections and removing certain of Appellants' claims (i.e., the Cherokee and EFP Claims) from certain of the Subordinated Indentures on Schedule S.  See In re Enron Creditors Recovery Corp., 370 B.R. 64 (Bankr. S.D.N.Y. 2007).[4]  The Bankruptcy Court's Opinion is premised on several errors of law and therefore must be reversed.

First, the Bankruptcy Court incorrectly concluded that, to qualify as "Senior Indebtedness" under the TOPRS Indentures, the promissory notes underlying the Cherokee and the EFP Claims must have been "sold for money borrowed."  In reaching this conclusion, the Bankruptcy Court failed to apply a rule of construction known as the "rule of the last antecedent."  The Bankruptcy Court's rationale for declining to apply this rule – which would

_____

[3]     The Debtors have indicated that they perceive this matter as an intercreditor dispute that will have no impact on the amount of funds available for distribution to creditors.  As a result, the Debtors have indicated that they are neutral with respect to this controversy.  (AA Tab 21 at 21-22)  Citations to "AA Tab __" refer to the Appellants' Appendix filed contemporaneously herewith.

[4]     Citations and references to the Opinion herein are to "Enron, 370 B.R. at __."

have compelled the opposite conclusion – directly contradicts two unanimous opinions of the Supreme Court interpreting statutory language that is substantially similar to that of the TOPRS Indentures. Furthermore, the Bankruptcy Court's strained interpretation of the TOPRS Indentures would not only exclude Appellants' claims from the definition of Senior Indebtedness, but also, if applied beyond the scope of the Objection, would exclude well over $3 billion of bank debt issued or guaranteed by Enron − a result that no party-in-interest sought and a result that the Bankruptcy Court itself recognized would be extraordinary.

Second, the Bankruptcy Court erred when it concluded that the EFP Claims were excluded from the definition of "Senior Indebtedness" under the 1987 Indenture. This conclusion was based in part upon the Bankruptcy Court's legal ruling that the EFP Claims were held by a "Subsidiary" as defined in the 1987 Indenture because, on the effective date of its chapter 11 plan (when subordinated debtholders might first receive distributions), Enron and/or its affiliates owned 100% of the voting shares of EFP. In so holding, however, the Bankruptcy Court ignored critical language in the 1987 Indenture which provides that subordinated creditors are subordinated *at the time of default*. At the time of default, and up through the date of the allowance of the EFP Claims, it is undisputed that Enron and/or its affiliates did <u>not</u> own 100% of the voting shares of EFP, and therefore the EFP Claims were not claims held by a Subsidiary.

Finally, the Bankruptcy Court ignored the plain meaning of the 1987 Indenture which limits the definition of "Subsidiary" to "corporations." Because EFP was a limited liability company – <u>not</u> a corporation – it could not have been considered a "Subsidiary" for purposes of excluding the EFP Claims from the definition of Senior Indebtedness.

The Bankruptcy Court's ruling should be reversed and the Cherokee and EFP Claims completely restored to Schedule S.

4

<u>S<small>TATEMENT OF THE</small> C<small>ASE</small></u>

At the time of its chapter 11 filing, Enron had approximately $1 billion in debt outstanding under multiple Subordinated Indentures. For purposes of these appeals, however, the only indentures that are relevant are the TOPRS Indentures and the 1987 Indenture.[5]

**The TOPRS Indentures**

Enron issued two series of 7.75% Subordinated Debentures due 2016 under two indentures, the first dated November 21, 1996, and the second, January 16, 1997 (collectively the "TOPRS Indentures").[6] (AA Tabs 5 and 6) Article 11 of each of the TOPRS Indentures sets forth their subordination provisions. Under Section 1101, the holders of TOPRS subordinated debt expressly agree that their right to payment is subordinate to the right of holders of "Senior Indebtedness" to be paid in full in cash or cash equivalents:

> The Company covenants and agrees, and each Holder of a Security, by his acceptance thereof, likewise covenants and agrees, that, notwithstanding anything to the contrary contained herein, to the extent and in the manner hereinafter set forth in this Article, the indebtedness represented by the Securities and the payment of the principal of and premium, if any, and interest on each and all of the Securities are hereby expressly made subordinate and subject in right of payment to the prior payment in full in cash or cash equivalents of all Senior Indebtedness (including any interest accruing after the occurrence of an Event of Default under Section 501(4) or (5)).

(AA Tabs 5 and 6 at 43)

---

[5]    The Subordinated Indentures also include the Loan Agreements executed November 15, 1993 and August 3, 1994 (the "1993 and 1994 Loan Agreements") in connection with the issuances of certain preferred securities by Enron. The Bankruptcy Court held that the Cherokee and EFP Claims were senior debt under the terms of the 1993 and 1994 Loan Agreements. Neither Baupost/Abrams nor any other party has appealed the Bankruptcy Court's ruling with respect to the 1993 and 1994 Loan Agreements.

[6]    As noted by Baupost/Abrams, the two TOPRS Indentures appear to be identical. (AA Tab 20 at 6, n.4)

The TOPRS Indentures define "Senior Indebtedness," to include (i) "all indebtedness of [Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money borrowed" and (ii) "all indebtedness of others of the kind described [above that are] assumed or guaranteed in any manner by [Enron]."  (AA Tabs 5 and 6 at 6)

**The 1987 Indenture**

Pursuant to an indenture, dated February 1, 1987 (the "1987 Indenture"), Enron issued the 8.25% Senior Subordinated Debentures due 2012 and the 6.75% Senior Subordinated Debentures due 2005.  (AA Tab 7)  Sections 1301 and 1302(a) of the 1987 Indenture state, in relevant part, that payment on the debentures is subordinated to the prior payment in full of all Senior Indebtedness:

> Section 1301.  *Securities Subordinated to Senior Indebtedness.*
>
> The Company agrees, and each Holder of the Securities by his or her acceptance thereof likewise agrees, that the payment of all Obligations on the Securities is subordinated, to the extent and in the manner provided in this Article, to the prior payment in full of all Senior Indebtedness . . . .
>
> Section 1302.  *Company Not to Make Payments with Respect to Securities in Certain Circumstances.*
>
> . . . (a) Upon the maturity of any Senior Indebtedness by lapse of time, acceleration (unless waived) or otherwise . . ., all Senior Indebtedness then due and owing shall first be paid in full, or such payment duly provided for in cash or in a manner satisfactory to all of the holders of such Senior Indebtedness, before any payment is made on account of any Obligations on the Securities . . . .
>
> . . . (b) Upon the happening of any default in payment of any Senior Indebtedness, then, unless and until such default shall have been cured or waived or shall have ceased to exist, no payment shall be made by the company with respect to any Obligations on the Securities.

(AA Tab 7 at 78-79)

The 1987 Indenture defines "Senior Indebtedness" as:

6

the principal of, and premium, if any, and interest on, any indebtedness of the Company (other than the Securities and any Exchangeable Subordinated Debentures issued and to be issued pursuant to the indenture, dated as of June 1, 1983 . . .) outstanding at any time . . . except indebtedness which by its terms is not superior in right of payment to the Securities.

(AA Tab 7 at 8)  The definition, however, expressly excludes "indebtedness of the Company to a Subsidiary for money borrowed or advanced from such Subsidiary." (Id.)  The 1987 Indenture, in turn, defines "Subsidiary" as

a corporation all of the voting shares (that is, shares entitled to vote for the election of directors, but excluding shares entitled so to vote only upon the happening of some contingency unless such contingency shall have occurred) of which shall be owned by the Company or by one or more Subsidiaries or by the Company and one or more Subsidiaries.

(AA Tab 7 at 9)

**Appellants' Relevant Schedule S Claims**

The Appellants hold claims against Enron arising from certain transactions with Enron, Enron North America Corp. ("ENA") and Enron Power Marketing, Inc. ("EPMI") that are typically referred to collectively as the Choctaw/Zephyrus Transactions.[7]

As set forth in detail in Proof of Claim No. 11132 (the "Cherokee Claim"), which was filed against Enron by JPMC in the name of Cherokee V.O.F. ("Cherokee"), as part of the Choctaw transactions, ENA issued a promissory note, dated November 1, 2001, to Cherokee in the amount of up to $820 million, plus interest.  (AA Tab 12 at 4)  Enron guaranteed to Cherokee all of ENA's obligations under the promissory note.  (Id.)

---

[7]    The facts relating to the Choctaw/Zephyrus Transactions are enormously complex and largely outside the scope of this Appeal.  The facts central to this Appeal were not disputed below and are set forth in the text.  To the extent the Court desires greater factual detail, it is set forth in the relevant proofs of claim and the motion to approve the Choctaw/Zephyrus Settlement (as defined herein).  (AA Tabs 9, 12 and 13)

Under the terms of a settlement approved by the Bankruptcy Court on or about May 28, 2004 (the "Choctaw/Zephyrus Settlement"), the Cherokee Claim was allowed against Enron in the amount of $796.5 million and assigned by Cherokee to JPMC as agent for the Choctaw lenders.  (AA Tab 14 at 10)

As set forth in detail in Proof of Claim No. 11126 (the "EFP Claims"), which was filed against Enron by JPMC in the name of Enron Finance Partners, LLC ("EFP"), as part of the Zephyrus transactions, ENA issued a promissory note, dated November 1, 2001, in favor of EFP in an amount of up to $508 million, plus interest (the "ENA/EFP Note").  (AA Tab 9 at 5)  Enron guaranteed to EFP all of ENA's obligations under the ENA/EFP Note.  (Id.)  In addition, Enron issued a promissory note, dated as of November 21, 2000 (the "ECIC Demand Note"), in the amount of $125 million, to Enron Capital Investments Corp. ("ECIC"), which ECIC then assigned to EFP.  (Id. at 4)

As of the Petition Date, Enron and certain of its affiliates owned EFP's Class A and Class B equity interests while Zephyrus Investments, LLC ("Zephyrus"), an entity wholly unrelated to Enron, owned of all of EFP's Class C interests.  (AA Tab 13 at 9-10)  Under the Third Amended and Restated Limited Liability Agreement of Enron Finance Partners, LLC (the "EFP Agreement"), management of EFP was ordinarily within the control of the Class A holders.  (AA Tab 8 at 47)  However, upon the occurrence of a "Specified Event," the Class C holders were authorized to appoint two directors to a three member board of directors entitled to manage EFP.  (Id.)  It is not disputed that certain downgrades of Enron's credit ratings before the Petition Date constituted such a Specified Event and gave Zephyrus, as the Class C holder, voting control of EFP.  Enron, 370 B.R. at 76.

8

Under the terms of the Choctaw/Zephyrus Settlement, the EFP Claims were allowed against Enron in the aggregate amount of $415.5 million, and were assigned by EFP to JPMC as agent for the Zephyrus Lenders.  (AA Tab 14 at 10-11)

**The Composition of Schedule S and the Resulting Litigation**

On December 2, 2001 and periodically thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the Bankruptcy Court.

The Debtors filed their Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan"), which was confirmed by the Bankruptcy Court by order dated July 15, 2004 (the "Confirmation Order").  As required by Section 510(a) of the Bankruptcy Code, the Plan enforces the terms of the subordination agreements contained in, among others, the TOPRS Indentures and the 1987 Indenture.  11 U.S.C. § 510(a).  Accordingly, Sections 8.1 and 9.1 of the Plan provide that the distributions that would otherwise be made to holders of subordinated debt will be made instead to holders of "Senior Indebtedness," as defined in the Subordinated Indentures (and excerpted in Exhibit L to the Plan).  (AA Tab 16)

Pursuant to the Plan and the Confirmation Order, before making initial distributions under the Plan, the Debtors were required to analyze the Subordinated Indentures and file a final Schedule S identifying the categories of claims qualifying as "Senior Indebtedness" under each Subordinated Indenture.  (AA Tab 17 at ¶ 74)  Subsequently, the Bankruptcy Court gave the Debtors until August 1, 2005 to file any modifications or amendments to Schedule S.  (AA Tab 18)

By notice of presentment, dated July 29, 2005, the Debtors submitted a form of order attaching an amended Schedule S ("Amended Schedule S") for approval by the

Bankruptcy Court. (AA Tab 19) Amended Schedule S identified the Cherokee Claim and the EFP Claims as "Senior Indebtedness" entitled to the benefits of subordination under the TOPRS Indentures and 1987 Indenture (as well as other Subordinated Indentures not relevant here).

The sole objection to Amended Schedule S was filed by Appellees Baupost/Abrams, who were also holders of other senior claims listed on Amended Schedule S. (AA Tab 20) Baupost/Abrams objected to the inclusion of certain specific claims on Amended Schedule S, including the Cherokee and EFP Claims, which Baupost/Abrams incorrectly described as "intercompany" claims.[8] (AA Tab 20 at 10)

**The Bankruptcy Court's Decision**

The Baupost/Abrams Objection was litigated in the Bankruptcy Court and, on May 29, 2007, the Bankruptcy Court issued the Opinion granting the Baupost/Abrams Objection in part and denying it in part. With respect to the issues relevant to this appeal, the Bankruptcy Court concluded that the Cherokee and EFP Claims were not entitled to the benefits of subordination under the TOPRS Indentures. The TOPRS Indentures, it noted, defined "Senior Indebtedness," as "all indebtedness of [Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money borrowed" as well as indebtedness of others of a similar kind that are assumed or guaranteed in any manner by Enron. Enron, 370 B.R. at 77-78. Interpreting this definition, the Bankruptcy Court held that the noun "notes" was modified by the last clause of the sentence, "sold for money borrowed." Id. at 79. Thus, under the Bankruptcy Court's construction, to constitute "Senior Indebtedness," "notes" evidencing Enron's indebtedness (and the guarantee claims backed by such notes) must have been "sold," rather than issued, "for money borrowed." Id. Because the Bankruptcy Court concluded that the

---

[8]    This appeal concerns only the Bankruptcy Court's ruling with respect to the Cherokee and EFP Claims under the TOPRS and 1987 Indentures.

promissory notes underlying the Cherokee and EFP Claims were not "sold for money borrowed," it held that those claims were not "Senior Indebtedness" and therefore not entitled to the benefits of subordination under the TOPRS Indentures.  Id. at 80.

In reaching this conclusion concerning the definition of "Senior Indebtedness" under the TOPRS Indentures, the Bankruptcy Court expressly declined to apply a rule of contract construction called the "rule of the last antecedent," under which, the Appellants argued, the clause "sold for money borrowed" would apply only to the antecedent immediately preceding it in the definition (i.e., "securities") and not to all other nouns in the sentence.  Id. at 78.  While the Bankruptcy Court conceded that the Appellants' "application of the last antecedent rule is consistent with the [Bankruptcy] Court's view of the rule," it nonetheless concluded that the rule was not applicable to the TOPRS Indentures because the word "other" preceded the word "securities" in the definition.  Id. at 78-79.

Notably, the Bankruptcy Court recognized that the construction it adopted – that to qualify as "Senior Indebtedness," "notes" had to be "sold for money borrowed" – was unusual.  Id. at 80-81.  Indeed, the Bankruptcy Court acknowledged that its interpretation would exclude virtually all bank debt and other debt that is "issued" from the definition of "Senior Indebtedness" under the TOPRS Indentures − a result it acknowledged was not common.  Id. at 80-81 and n.8.  Indeed, no party-in-interest even suggested that bank debt should be excluded from the definition of "Senior Indebtedness" under the TOPRS Indentures.

The Bankruptcy Court also held that the EFP Claims were not entitled to the benefits of subordination under the 1987 Indenture.  Id. at 72-77.  The 1987 Indenture, it held, expressly excludes from the definition of "Senior Indebtedness" "indebtedness of [Enron] to a Subsidiary for money borrowed or advanced from such Subsidiary."  Id. at 73.  Under the 1987

Indenture, it held, a "Subsidiary" is defined as a "corporation" <u>all</u> of whose voting shares are owned directly or indirectly by Enron and/or its affiliates. <u>Id</u>. at 74. While Enron, as a Class A member of EFP, generally had the right to appoint and remove directors, upon a default, the Class C interests, which were held by Zephyrus (an entity controlled by JPMC and not Enron), became entitled to appoint or remove a majority of the board of directors. <u>Id</u>. at 76. Accordingly, the Bankruptcy Court found that, as a result of certain downgrades of Enron's credit ratings in 2001, EFP was not a "Subsidiary" on the Petition Date. <u>Id</u>. The Choctaw/Zephyrus Settlement in May 2004, it held, resulted in the redemption and cancellation of the Class C shares and a termination of Class C voting rights. <u>Id</u>. This transaction therefore left Enron and its affiliates with all of the voting power in EFP and, upon its approval in May 2004, rendered EFP a Subsidiary of Enron for purposes of the 1987 Indenture. <u>Id</u>. at 77.

Having determined that the status of EFP as a "Subsidiary" changed shortly before the effective date of Enron's Plan, the Bankruptcy Court held that the relevant date upon which to determine the status of an entity as a "Subsidiary" is the date the subordination obligation of the subordinated debtholders to the senior creditors arises. <u>Id</u>. The Bankruptcy Court concluded that the subordination obligations arose at the time of distribution, when the subordinated noteholders would otherwise be entitled to receive payment but for the subordination provisions. <u>Id</u>.

Finally, the Bankruptcy Court rejected the Appellants' contention that EFP, which was organized as a limited liability company, did not qualify as a "corporation" for purposes of the definition of "Subsidiary" under the 1987 Indenture. <u>Id</u>. at 75.

**The Motion for Clarification and the Order Further Amending Schedule S**

Shortly after the Bankruptcy Court issued its Opinion, the Reorganized Debtors filed a motion seeking clarification of that Opinion.  (AA Tab 22)  Because the Bankruptcy Court's interpretation of "Senior Indebtedness" would arguably exclude essentially <u>all</u> debt issued under bank credit agreements from the definition of Senior Indebtedness under the TOPRS Indenture, <u>see</u> <u>Enron</u>, 370 B.R. at 81 n.8, the Reorganized Debtors sought clarification as to whether the Bankruptcy Court intended its Opinion to apply to additional claims that were not the subject of the Objection (AA Tab 22 at 4-5).  The Bankruptcy Court clarified that because no party-in-interest had objected to the inclusion of such claims on Amended Schedule S, its Opinion would be limited to only those claims specifically objected to in the Baupost/Abrams Objection.  (AA Tab 23)  On July 24, 2007, the Court entered the Order which sustained in part and overruled in part the Baupost/Abrams Objection, and attached a final Schedule S (the "Second Amended Schedule S"), subject only to this Appeal.  (AA Tab 1)

On August 3, 2007, JPMC (as agent on behalf of the Choctaw and Zephyrus lenders) filed a timely notice of appeal from the Order which was docketed in this Court as Case No. 07-7757.  (AA Tab 3)  On August 13, 2007, the Choctaw/Zephyrus Appellants also timely filed a notice of appeal from the Order which was docketed as Case No. 07-7941.  (AA Tab 4)  The two appeals are collectively referred to herein as the "Appeal."

<u>A</u><u>RGUMENT</u>

**I.       Standards for Contact Interpretation**

A contract's proper construction is a question of law for the court.  <u>Metro. Life Ins. Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884, 889 (2d Cir. 1990).  "Where unambiguous, courts are to interpret contractual language pursuant to its plain meaning, especially when dealing with

13

'sophisticated counseled business people negotiating at arm's length.'" <u>Aristocrat Leisure Ltd.</u> <u>v. Deutsche Bank Trust Co. Ams.</u>, No. 04-10014, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005) (quoting <u>Vt. Teddy Bear Co. v. 538 Madison Realty Co.</u>, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 767 (N.Y. 2004)).   "A contract must be construed, if possible, to avoid an interpretation that will result in an absurdity, an injustice or have an inequitable or unusual result." <u>Natwest USA Credit Corp. v. Alco Standard Corp.</u>, 858 F. Supp. 401, 413 (S.D.N.Y. 1994) (citing <u>Silinsky v. State-Wide Ins. Co.</u>, 289 N.Y.S.2d 541, 549 (N.Y. App. Div. 1968)); <u>see also</u> <u>Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, No. 96-7874, 2002 WL 31106406, at *7 (S.D.N.Y. Sept. 20, 2002).

As discussed below, applying these principles of contract interpretation, it is clear that the Bankruptcy Court committed reversible error when it held that (i) the EFP and Cherokee Claims were not entitled to the benefits of subordination under the TOPRS Indentures and (ii) the EFP Claims were not entitled to the benefits of subordination under the 1987 Indenture.[9]

## II.    The Bankruptcy Court Erred When it Concluded that the Cherokee and <u>EFP Claims Were Not Senior Indebtedness Under the TOPRS Indentures</u>

The Bankruptcy Court held that, because the promissory notes evidencing the Cherokee and EFP Claims were not "sold for money borrowed," those claims did not fall within the definition of "Senior Indebtedness" and therefore were not entitled to the benefits of subordination under the TOPRS Indentures.   <u>Enron</u>, 370 B.R. at 80.   In so holding, the Bankruptcy Court (i) failed to apply the rule of the last antecedent for reasons that have twice been rejected by a unanimous Supreme Court and (ii) erred by concluding that the plain meaning

---

[9]    While the Objection initially objected to the Cherokee Claim's inclusion on Schedule S with respect to the 1987 Indenture, that aspect of the Objection was subsequently withdrawn by Baupost/Abrams.

of its interpretation of the TOPRS Indentures did not lead to absurd or unusual results. For each of these reasons, the Bankruptcy Court's Order must be reversed.

A.    **The Bankruptcy Court Misapplied the Rule of the Last Antecedent**

Among the well-recognized principles of contractual and statutory construction is the rule of the last antecedent. That rule provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." Barnhart v. Thomas, 540 U.S. 20, 26, 124 S. Ct. 376, 380 (2003); see also United States v. Kerley, 416 F.3d 176, 180 (2d Cir. 2005). Applied to the definition of Senior Indebtedness in the TOPRS Indentures, the rule of the last antecedent provides that the phrase "sold for money borrowed" modifies only the noun that immediately precedes it (i.e., "other securities") and not each of the other nouns preceding it in the clause. Accordingly, under this rule, the term "notes" would not be modified by the phrase "sold for money borrowed" and the promissory notes (and guarantees of those notes) underlying the Cherokee and EFP Claims would clearly constitute "Senior Indebtedness" entitled to the benefits of subordination under the TOPRS Indentures.

The Bankruptcy Court, however, expressly declined to apply the rule of the last antecedent to the definition of "Senior Indebtedness" under the TOPRS Indentures, holding that the phrase "sold for money borrowed" modified not only the noun "securities" but every other noun in the clause including "notes." It reached this conclusion for the sole reason that the term "securities" was preceded by the word "other" in the definition:

> Were the term "other" omitted, then the modifier [sold for money borrowed], as applied solely to securities, would not relate to the previous items. However, because the type of securities that are similar to the previous enumerated items are "securities sold for money borrowed," the Court concludes, based upon the inclusion of the word "other" preceding the term "securities sold for money borrowed," that the item that follows "other" is similar to the items that precede it.

15

Enron, 370 B.R. at 79 (emphasis added).

    The Bankruptcy Court's conclusion that the presence of the word "other" renders the last antecedent rule inapplicable is incorrect.  In fact, a unanimous Supreme Court has twice specifically rejected this contention, applying the rule to language substantially similar to that contained in the TOPRS Indentures, notwithstanding the presence of the word "other."

    In Federal Trade Commission v. Mandel Bros. Inc., the Court interpreted the term "invoice" under the Fur Products Labeling Act.  359 U.S. 385, 79 S. Ct. 818 (1959).  The statute defined the term to mean "a written account, memorandum, list or catalog . . . transported or delivered to a purchaser, consignee, factor, bailee, correspondent, or agent, *or any other person who is engaged in dealing commercially in fur products or furs*."  Id. at 386, 79 S. Ct. at 821 (emphasis supplied).  Relying on the presence of the word "other," the Third Circuit had declined to apply the last antecedent rule, concluding that the phrase "engaged in dealing commercially" modified not only "any other person" but all of the other preceding terms in the definition.  Id. at 389, 79 S. Ct. at 822.  The Supreme Court reversed, holding that, notwithstanding the presence of the word "other," the limiting clause applied only to the last antecedent.  Id. at 390, 79 S. Ct. at 823.  The Supreme Court found that the Third Circuit's construction represented a "partial mutilation" of the statutory language.  Id.

    More recently, in Barnhart v. Thomas, the Supreme Court interpreted a provision of the Social Security Act which specified that an individual would be deemed disabled if his impairments were so severe that "*he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.*"  540 U.S. at 23, 124 S. Ct. at 379 (emphasis in original).  The Third Circuit had held that the phrase "which exists in the national economy"

modified the terms "other kinds of substantial work" and also "previous work," reasoning that, by referring first to "previous work," and then to "*any other* kind of substantial gainful work which exists in the national economy," the statute indicates that the former is a species of the latter.  Id. at 26, 124 S. Ct. at 380.

Once again, the Supreme Court reversed.  The Third Circuit's interpretation, it held, "disregards – indeed, is precisely contrary to – the grammatical 'rule of the last antecedent.'"  Id.  The Supreme Court held that the phrase "which exists in the national economy" should be read as modifying only the noun or phrase that it immediately follows (i.e., "any other kind of substantial gainful work").  Id.  In further explaining the holding of a unanimous Supreme Court, and to illustrate the error of the Third Circuit, Justice Scalia offered the following example:

> Consider, for example, the case of parents who, before leaving their teenage son alone in the house for the weekend, warn him, "You will be punished if you throw a party or engage in any other activity that damages the house."  If the son nevertheless throws a party and is caught, he should hardly be able to avoid punishment by arguing that the house was not damaged.

Id. at 27, 124 S. Ct. at 381; see also United States v. Martin, 438 F.3d 621, 631 (6th Cir. 2006) (holding that use of the phrase "[that] the Sentencing Commission considers appropriate" modified only "*other* data" and did not apply to other preceding phrases).

Interpreting the plain meaning of the TOPRS Indentures in accordance with the rule of the last antecedent makes perfect sense here.  The phrase "sold for money borrowed" is necessary to limit the catchall term "securities" to those securities sold as part of a debt financing transaction and to exclude from the definition of "Senior Indebtedness," indebtedness arising in

connection with other securities, such as equity securities (e.g., obligations to pay dividends on preferred stock, repurchase obligations, etc.).[10]

There is no dispute that the Cherokee and EFP Claims are evidenced by "notes." The sole basis for the Bankruptcy Court's conclusion that the Cherokee and the EFP Claims are not "Senior Indebtedness" was that the particular "notes" were not "sold for money borrowed." Because that conclusion was based on an improper construction of the TOPRS Indentures and a failure to apply the rule of the last antecedent, the Bankruptcy Court erred as a matter of law. Accordingly, the Cherokee and EFP Claims constitute "Senior Indebtedness" entitled to the benefits of subordination under the TOPRS Indentures.

**B.    The Plain Meaning of the Bankruptcy Court's Interpretation Would Lead to Absurd or Unusual Results**

That the Bankruptcy Court committed reversible error in interpreting the TOPRS Indentures is further underscored by the absurd and unusual results caused by the Bankruptcy Court's interpretation. "[A] contract must be construed, if possible to avoid an interpretation that will result in an absurdity, an injustice or have an unusual result." Natwest USA Credit Corp. v. Alco Standard Corp., 858 F. Supp. 401, 413 (S.D.N.Y. 1994) (emphasis added) (citing Silinsky v. State-Wide Ins. Co., 289 N.Y.S.2d 541, 549 (N.Y. App. Div. 1968); see also Granite Partners,

---

[10]    In addressing this argument below, the Bankruptcy Court erroneously concluded that the whole definition of "Senior Indebtedness" deals with debt and not equity. Enron, 370 B.R. at 79. The Bankruptcy Court reasoned that an additional phrase was not necessary to distinguish debt from equity because "indebtedness" does not concern equity. However, the term "indebtedness," although not defined in the TOPRS Indentures, has a very broad meaning. Black's Law Dictionary defines "indebtedness" as "the condition or state of owing money" or "something owed; a debt." Black's Law Dictionary 783 (8th ed. 2004). Accordingly, an obligation to pay money, if evidenced by an equity security (such as a dividend on preferred stock) would constitute "Senior Indebtedness." Because subordinated debt typically ranks senior to obligations arising out of equity instruments, it would therefore be necessary to modify the term "other securities" with the phrase "sold for money borrowed." The phrase "sold for money borrowed" in the TOPRS Indentures does precisely that and nothing more.

L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc., No. 96-7874, 2002 WL 31106406, at *7 (S.D.N.Y. Sept. 20, 2002).

Here, the Bankruptcy Court's conclusion that requires "notes" to be "sold for money borrowed" to qualify as "Senior Indebtedness" under the TOPRS Indentures, if applied beyond the scope of the Objection, would lead to an unusual, if not an absurd, result. Indeed, as the Bankruptcy Court noted, all parties agreed that a requirement that notes be "sold" is not ordinary. Enron, 370 B.R. at 80. Moreover, as the Bankruptcy Court also noted, its interpretation would exclude virtually all bank debt and other debt that is "issued" rather than "sold" from the definition of "Senior Indebtedness" under the TOPRS Indentures. Id. at 80-81, n.8; see also Charles J. Woelfel, Encyclopedia of Banking and Finance 1098 (10th ed. 1994) ("[S]enior debt typically includes funds borrowed from banks, insurance companies, and other financial institutions, as well as all other forms of notes or other debentures not expressly subordinated"). No party-in-interest, including Baupost/Abrams, has ever advanced an interpretation that the $3 billion in bank debt that the Debtors scheduled should be excluded. Indeed, Enron included its bank debt on the Amended Schedule S, reflecting its understanding that such debt was intended to receive the benefits of subordination under the TOPRS Indentures.[11] Any distinction between notes that are "sold" and notes that are "issued" for

_____

[11]     The inclusion of Enron's bank debt on Schedule S is not the subject of this Appeal and is discussed purely for illustrative purposes. Indeed, shortly after the Bankruptcy Court issued the Opinion, Enron filed a motion for clarification as to whether the Bankruptcy Court intended its ruling to be applied to claims (such as bank debt) that were not the subject of the Baupost/Abrams Objection. (AA Tab 22) The Bankruptcy Court made it clear that its Opinion did not apply to those claims and was limited only to the claims that were the specific subject of the Objection. (AA Tab 23) Given that no party-in-interest had ever objected to the inclusion of other claims (such as bank debt) on Schedule S, the Bankruptcy Court did not require the Debtors to make any further modifications. Accordingly, the Bankruptcy Court entered the final Order approving Second Amended Schedule S (which includes bank debt) subject only to this Appeal.

purposes of identifying "Senior Indebtedness" at best exalts form over substance, and at worst excludes all credit agreement debt and bond indenture debt from the TOPRS Indentures' definition of "Senior Indebtedness."

Because the Opinion not only runs contrary to the last antecedent rule, and the application of such rule by several Supreme Court cases, but also leads to an absurd and unusual result, the Opinion should be reversed, and the TOPRS Indentures' definition of Senior Indebtedness should be interpreted to include the Cherokee and EFP Claims.

### III.    The 1987 Indenture Unambiguously Provides that the EFP Claims Constitute "Senior Indebtedness"

The Bankruptcy Court held that the EFP Claims fell outside the definition of "Senior Indebtedness" under the 1987 Indenture because it found that the EFP Claims were "indebtedness owed to a Subsidiary." Enron, 370 B.R. at 77. This conclusion is incorrect as a matter of law because (i) Enron did not own all of the voting shares of EFP, as required by the definition of "Subsidiary" in the 1987 Indenture, at the time the subordination obligations arose and (ii) EFP was organized as a limited liability company and thus fell outside the definition of "Subsidiary" for that reason as well.

### A.    Enron and/or its Affiliates Did Not Own All of the Voting Shares of EFP Upon the Relevant Occurrence of a Subordination Event

Under the 1987 Indenture, for an entity to be considered a "Subsidiary," all of the voting shares of such entity must be held by Enron and/or its affiliates. (AA Tab 7 at 9) Here, it is undisputed that, upon the downgrade of Enron's credit ratings that occurred prior to the Petition Date, JPMC (through Zephyrus) was entitled to appoint two of the three directors of EFP. Enron, 370 B.R. at 76. Thus, as was found by the Bankruptcy Court and is not disputed by Baupost/Abrams, Enron was not in control of all of the voting shares of EFP as of the Petition Date, and therefore EFP was not a "Subsidiary" of Enron at that time. Id.

There is also no dispute that EFP continued to be controlled in part by Zephyrus through the next 2-1/2 years of Enron's chapter 11 proceedings, up through the effective date of the Choctaw/Zephyrus Settlement.  Id. at 76-77.  The Choctaw/Zephyrus Settlement, which allowed the EFP Claims, also provided for Cherokee and EFP – which were created purely for the purpose of the Choctaw/Zephyrus loans – to be dismantled.  Accordingly, JPMC (acting for the Zephyrus lenders) entered into a Redemption Agreement, dated May 10, 2004, redeeming Zephyrus' membership interests in EFP and returning ownership of EFP to Enron.  (AA Tab 15)

The Bankruptcy Court concluded that because Enron regained voting control of EFP upon the effectiveness of the Choctaw/Zephyrus Settlement, EFP once again became a "Subsidiary" of Enron at that time, and the EFP Claims simultaneously ceased to constitute "Senior Indebtedness" under the 1987 Indenture.  Enron, 370 B.R. at 77.  This conclusion was significant because the Bankruptcy Court also held that the relevant date to determine the status of an entity as a "Subsidiary" for purposes of the definition of "Senior Indebtedness" was the date the subordination obligations in the 1987 Indenture arose.  Id.  The Bankruptcy Court erred as a matter of law, however, by holding that the subordination obligations arose when the bondholders' turnover obligations matured, rather than the date on which the subordination became effective.

Like other inchoate subordination agreements, the 1987 Indenture allows periodic payment of interest and principal on the notes issued pursuant to it, and does not require subordination in right of payment of those notes until a certain contingency or condition-subsequent occurs.  See Sumitomo Trust & Banking Co. v. Holly's Inc. (In re Holly's Inc.), 140 B.R. 643, 674 (Bankr. W.D. Mich. 1992) (noting that inchoate subordination does not take effect until condition subsequent occurs).  As one commentator explained, while inchoate agreements

may provide for subordination upon the occurrence of a voluntary or involuntary distribution of assets, an inchoate subordination agreement "may be made more stringent . . . by prohibiting payments to the subordinator during the continuance of any default in payment of the senior debt, rather than waiting until actual bankruptcy of the debtor." Dee Martin Calligar, Subordination Agreements, 70 Yale L.J. 376, 377-78 (1960).

It is clear from the face of the 1987 Indenture that its subordination obligations arise upon Enron's failure to pay Senior Indebtedness when such debt becomes due and not at the time that the subordinated debtholders receive distributions that they may be obligated to turnover. Sections 1302(a) and (b) of the 1987 Indenture provide:

> (a) *Upon the maturity of any Senior Indebtedness by lapse of time, acceleration (unless waived) or otherwise*. . ., all Senior Indebtedness then due and owing shall first be paid in full, or such payment duly provided for in cash or in a manner satisfactory to all of the holders of such Senior Indebtedness, before any payment is made on account of any Obligations on the Securities . . . .

> (b) *Upon the happening of any default in payment of any Senior Indebtedness*, then, unless and until such default shall have been cured or waived or shall have ceased to exist, no payment shall be made by the company with respect to any Obligations on the Securities.

(AA Tab 7 at 79 (emphasis added); see also id. at 78 (Section 1301 provides that each noteholder agrees that the payment of its obligations is subordinated to the extent and in the manner provided in Article 13).) Thus, the contingent event which triggers the subordination obligations is not the receipt by subordinated debtholders of distributions, as the Bankruptcy Court found, but rather the occurrence of a payment default under the terms of the Senior Indebtedness. Such payment defaults arose with respect to the EFP Claims shortly before and on the Petition Date –

a time when EFP, indisputably, was <u>not</u> a "Subsidiary" of Enron for purposes of the 1987 Indenture.[12]

In <u>UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.</u>, this District Court interpreted a subordinated indenture with a provision virtually identical to Section 1302(b) of the 1987 Indenture. 793 F. Supp. 448, 457-59 (S.D.N.Y. 1992). In <u>UPIC</u>, the court concluded that "[u]pon a continuing default in payment of principal or interest on Senior Indebtedness . . . Section 6.03(b)(1) effects a subordination of the Securityholders' right to payment of principal of and interest on the Securities by directing that any such payment be made not to the Securityholders but to or for the benefit of holders of Senior Indebtedness." <u>Id</u>. (internal citations and emphasis omitted). The court's ruling in <u>UPIC</u> applies here. Although the 1987 Indenture also obligates subordinated debtholders to turn over any distributions they receive to holders of Senior Indebtedness (<u>see</u> 1987 Indenture § 1303, AA Tab 7 at 80), the subordination of their claims had already occurred under Section 1302 before these cases were filed, when Enron defaulted on its payments of the ENA Note and ECIC Demand Note (<u>i.e.</u>, long before distributions were to be made).

Because the Bankruptcy Court did not give effect to Section 1302(b) of the 1987 Indenture when it determined that Enron and its affiliates held all of the voting shares of EFP, the Bankruptcy Court erred as a matter of law in holding that the EFP Claims were held by a "Subsidiary" and thus excluded from the definition of "Senior Indebtedness" under the 1987 Indenture.

---

[12]    Under the ENA Note, payment default occurred when the Debtors failed to repay such note on its stated maturity of November 30, 2001, and under the ECIC Demand Note, payment default occurred upon the Petition Date. (AA Tabs 10 and 11)

**B.    The EFP Claims Were Not Held by a "Subsidiary" Because EFP
Was Not a "Corporation" for Purposes of the 1987 Indenture**

Under the 1987 Indenture, only a "corporation" can qualify as a "Subsidiary."

(AA Tab 7 at 9)  As used in the 1987 Indenture, the term "corporation" includes "corporations,

voluntary associations, joint stock companies and business trusts."  (Id. at 3)  Notably absent

from within the definition of "corporation" are limited liability companies, such as EFP.  The

Bankruptcy Court concluded that (i) the use of the term "includes" when defining "corporation"

suggests that the definition is not restricted to the specific organizational forms listed and

(ii) limited liability companies, because they share attributes similar to those of corporations,

voluntary associations, business trusts and joint stock companies, fall within the definition of

"corporation."  Enron, 370 B.R. at 75.

However, the Bankruptcy Court's conclusion ignores the fact that limited liability

companies also share attributes similar to partnerships, which are not included within the

definition of "corporation" under the 1987 Indenture.  See e.g., Lattanzio v. Comm. on Massage

Therapy Accreditation, 481 F.3d 137, 140 (2d Cir. 2007) (noting that limited liability company is

a hybrid of the partnership and corporate forms); Bischoff v. Boar's Head Provisions Co., 436 F.

Supp. 2d 626, 630 (S.D.N.Y. 2006) (same); Tzolis v. Wolff, 829 N.Y.S.2d 488, 491 (N.Y. App.

Div. 2007) ("The Limited Liability Company Law is a hybrid of the corporate and limited

partnership forms, offering the tax benefits and operating flexibility of a limited partnership with

the liability protection a corporation provides."); In re ICLNDS Notes Acquisition, LLC, 259

B.R. 289, 294 (Bankr. N.D. Ohio 2001) (observing that LLCs have attributes of partnerships and

corporations); Tex. Rev. Civ. Stat. art. 1528n, Art. 2.02 (limited liability companies have powers

provided for corporations and limited partnerships).  While the drafters of the 1987 Indenture

included "partnership" within the definition of "person," they did not do so with respect to the

24

definition of "corporation." (AA Tab 7 at 6) Therefore, it can equally be said that because limited liability corporations are similar to partnerships, the definition of "corporation" should not be expanded to include limited liability companies.

In addition, also included in the definition of "person" but not included in the definition of "corporation" are "unincorporated organizations." (AA Tab 7 at 6) Notably, New York Limited Liability law defines a limited liability company as "an unincorporated organization of one or more persons having limited liability for the contractual obligations and other liabilities of the business . . ." N.Y. CLS LLC § 102(m).

Therefore, because limited liability companies are similar to both "partnerships" and "unincorporated organizations" and both organizational forms are included within the definition of "person" but not included within the definition of "corporation," the definition of "corporation" should not be expanded to include limited liability companies. Accordingly, because EFP, a limited liability company, was not a "corporation," the EFP Claims cannot be indebtedness held by a "Subsidiary" and therefore must constitute "Senior Indebtedness" entitled to the benefits of subordination under the 1987 Indenture.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Order should be reversed to the extent it provides that (i) the EFP Claims do not constitute "Senior Indebtedness" under the 1987 Indenture and (ii) the Cherokee and EFP Claims do not constitute "Senior Indebtedness" under the TOPRS Indentures.

Dated: October 5, 2007

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By  /s/ P. Bradley O'Neill
    P. Bradley O'Neill, Esq.
    Amy Caton, Esq.
    Daniel M. Eggermann, Esq.
    1177 Avenue of the Americas
    New York, New York 10036
    Tel:  (212) 715-9100

*Counsel to JP Morgan Chase Bank, N.A. and
Choctaw/Zephyrus Appellants*

    and

KELLEY DRYE & WARREN LLP
Sarah Reid, Esq.
Alison MacGregor, Esq.
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800

*Counsel to JP Morgan Chase Bank, N.A.*