```
 1                    Proceedings
 2    capable of more than one interpretation.
 3                    If Your Honor doesn't have any
 4    further questions, let me go on to the TOPRS
 5    Indentures.  For purposes of Intercompany
 6    Claims, the definition of "Senior
 7    Indebtedness" in the TOPRS Indentures turns
 8    on two principles.  The first is the
 9    indebtedness has to be evidenced by notes,
10    bonds, debentures, or other securities.  This
11    definition is actually certainly different
12    than the definitions used in 1987 Indenture
13    or the two Loan Agreements and it is
14    certainly, at least in Baupost/Abrams' view,
15    more limiting, because it requires evidence
16    of a Note/Bond Debenture and it has "or other
17    security."  The 1987 Indenture uses "other
18    instruments" and, of course, the Loan
19    Agreements don't have anything like that.
20                    Then the other key aspect, and
21    which is why we think the Enron Finance
22    Claims and the Cherokee Claims have to come
23    off the list, is the indebtedness has to be
24    sold by Enron.  This is somewhat of a curious
25    definition.  I don't know if I have ever seen
```

```
 1                   Proceedings
 2   it in any other indenture.  It is certainly
 3   not in the 1987 Indenture, but it is the
 4   language that is used in the TOPRS
 5   Indentures.
 6                   None of the Intercompany Claims for
 7   which we have objected that are remaining --
 8   the Enron Finance Claims and the Cherokee
 9   Claims -- are ones that were sold by Enron.
10   Contrast that to the claims of Enron Equity
11   Corporation.  We had initially objected to
12   it, but after it was demonstrated to Baupost
13   and Abrams that these particular claims were,
14   in fact, sold by Enron, there was a warrant
15   to purchase these notes that was held by
16   Enron Equity Corporation.  That is nothing
17   like that with respect to the Enron Finance
18   Claims or the Cherokee Claims.  This
19   language, we submit, is unambiguous and no
20   other party with respect to the Intercompany
21   Claims has disputed the terms as ambiguous
22   with respect to what is meant by "sold by."
23                   I have one other point to add, by
24   using the terms "notes, bonds, debentures, or
25   other securities sold by Enron," it suggests
```

1              Proceedings

2    notes, bonds, and debentures are things that

3    will be sold into the public market.  So for

4    purposes of trying to understand whether or

5    not this term is ambiguous or unambiguous,

6    Baupost/Abrams submits it is unambiguous.

7    The term is what it says, these claims have

8    to be sold by Enron; and Enron Finance and

9    Cherokee Claims were not.

10             If Your Honor doesn't have any

11   further questions, I was going to turn to the

12   Letter of Credit Claim?

13             JUDGE GONZALEZ:  No.  Go ahead.

14             MR. WINSTON:  Again, each of the

15   claims that we have objected to are claims

16   for which Enron has an obligation to

17   reimburse the issuer of a letter of credit.

18   With respect to the 1987 Indenture, the 1987

19   expressly excludes from the definition of

20   "indebtedness" contingent obligations in

21   connection with the indebtedness of others.

22   The carve-out seems to expressly state that

23   agreements to ensure the payment of

24   obligations of third parties are ones that

25   are excluded from the definition of

1              Proceedings

2    "indebtedness."  Now, if it is not

3    indebtedness, then it can't be Senior

4    Indebtedness.  It is hard to conceive that

5    obligations to reimburse an issuer of a

6    letter of credit would not fall within that

7    carve-out.

8              By definition, you are reimbursing

9    a party, who has already paid somebody else,

10   for which you have your own independent

11   obligation.  How is that not a conditional

12   obligation to ensure the payment to a third

13   party, is one that I can't believe there is

14   any dispute.

15             Now, one argument that has not been

16   made, but it may be made, is whether or not

17   the 1987 Indenture measures whether an

18   obligation is contingent on the moment the

19   obligation is created or at some time in the

20   future.  Baupost/Abrams argues for purposes

21   of the Letter of Credit Claims, it is

22   measured from the date the obligation was

23   created and there are two reasons for that.

24             The first point is any other result

25   would be absurd, because any contingent

1                    Proceedings

2    obligation will at some point in the future

3    be non-contingent, either the contingency

4    will pass and there is no obligation or the

5    contingency will come to fruition and there

6    is a liquidated obligation.  Why would you

7    have this exclusion, unless you measured the

8    date the obligation is created?

9                    The second point is compared to the

10    definition of "Subsidiary."  The definition

11    of "Subsidiary" in the 1987 Indenture

12    expressly contemplates future events, because

13    it is certainly possible, as the 1987

14    Indenture points out, that voting control of

15    one of the entities, for which we have

16    qualified as a Subsidiary, is in the hands of

17    third parties, but that voting power is

18    contingent on the date the obligation was

19    created, where in the future it may manifest

20    itself.  So that party does have voting

21    control.  For purposes of the definition of

22    "Subsidiary," it would no longer be a

23    subsidiary because a third party has voting

24    power.  There is nothing like that with

25    respect to any other conditional obligations.

```
 1                    Proceedings
 2              So for purposes of determining
 3    whether or not letters of credit
 4    reimbursement obligation are within the
 5    definition of "indebtedness" and, therefore,
 6    within the definition of "Senior
 7    Indebtedness," Baupost/Abrams submits they
 8    are clearly not.
 9              The last point, Your Honor, with
10    respect to the 1987 Indenture, goes to the
11    definition of "Senior Indebtedness." As I
12    mentioned earlier, it requires an obligation
13    evidenced by a note, bond, or instrument for
14    money borrowed. Under the principle of
15    ejusdem generis, Courts look to the phrase
16    "other instruments" in relation to bonds,
17    debentures, and notes. A bond, debenture, or
18    note in an unconditional promise to pay an
19    amount of money, and an obligation to
20    reimburse a letter of credit issuer is not an
21    obligation to pay a fixed amount of money.
22    It depends on the amount of the draw. So it
23    is not like a note, bond, or debenture and,
24    therefore, it is not an instrument and,
25    therefore, it is Non-Senior Indebtedness.
```

1               Proceedings

2          The last point or the last part of

3    my argument goes to the TOPRS Indentures, and

4    I think this one is the easiest of all of

5    them.  In order to cause Senior Indebtedness,

6    as I mentioned earlier, an obligation must be

7    evidenced by note, bond, debenture, or other

8    security and has to be sold by Enron.

9    Obligations to reimburse letter of credit

10   issuers are not notes, bonds, debentures, or

11   other securities.  It is even more narrow

12   than the 1987 Indenture, and they are not

13   obligations for which Enron sold anything.

14   It is a contractual agreement to reimburse

15   somebody.  That is not an obligation to sell.

16          Unless Your Honor has any further

17   questions, I have finished my presentation.

18          JUDGE GONZALEZ:  No.  I don't at

19   this time.

20          MR. WINSTON:  Thank you, Your

21   Honor.

22          JUDGE GONZALEZ:  I assume you are

23   rising for John Hancock?  Is that right,

24   Mr. Wiles?

25          MR. WILES:  Yes.

```
 1                   Proceedings
 2            JUDGE GONZALEZ:  And who else?
 3            MS. REID:  Your Honor, Sarah Reid
 4     for JPMorgan Chase.
 5            MS. KRIEGER:  And Arlene Krieger
 6     from Stroock on behalf of Bayerische Hypo-Und
 7     Vereinsbank.
 8            MS. CATON:  And Amy Caton from
 9     Kramer Levin on behalf of the
10     Choctaw/Zephyrus Holders, each on behalf of
11     themselves and certain managed funds and
12     accounts.
13            JUDGE GONZALEZ:  We will commence
14     with the one closest to the microphone.
15            MR. WILES:  Thank you, Your Honor.
16     I guess the race is to the swift.
17            JUDGE GONZALEZ:  Please speak
18     louder though, please.
19            MR. WILES:  Michael Wiles for John
20     Hancock Life Insurance Company.
21            Your Honor, we do not have a letter
22     of credit issue.  We only have an issue as to
23     the treatment of notes, because John Hancock
24     was not involved in any letters of credit.
25     So I am not going to address any of the
```

1              Proceedings

2    letter of credit issues.  They just don't

3    affect us.

4              What John Hancock has is, by virtue

5    of a settlement, it has an assignment of

6    Enron Equity Corporation's interests in three

7    promissory notes of approximately $107

8    million that were signed and executed by

9    Enron Corporation.

10             Now, there are a couple of things

11   that I would like to address.  Number one, is

12   the comment by Baupost as to what standard of

13   review or burden of proof should apply.  I

14   will note that the cases that Baupost has

15   cited are cases in which a creditor whose

16   claim is being subordinated is challenging

17   somebody else's right to force that creditor

18   to be subordinated to that person.

19             In this situation, absolutely

20   nobody whose claim is being subordinated has

21   objected to what the Debtors have proposed in

22   their Schedule S.  The Debtor, which is a

23   party to all of these agreements, obviously

24   hasn't objected.  In fact, the Debtors have

25   stated that their own understanding of how

```
 1                  Proceedings
 2    these agreements work is that the parties
 3    listed on Schedule S are entitled to the
 4    benefits of subordination.  No other party
 5    who is a beneficiary of subordination has
 6    objected.  You have only got Baupost, which
 7    is not a party to any of the agreements, it
 8    is not a subordinated party, and it is only
 9    one of the beneficiaries.  They are the only
10    ones that have challenged what Enron has
11    proposed and what Enron and everybody else
12    involved agree is the correct interpretation
13    of these contracts.
14              I do not think it is right under
15    those circumstances to say that it is
16    everybody else's heavy burden to prove that
17    Baupost is wrong.  Quite the contrary.
18    Baupost is not a party to these agreements.
19    I would say the burden is on Baupost to show
20    that for some reason, as an interloper to the
21    contracts, as only one beneficiary, it
22    somehow has a superior understanding to
23    everybody else's understanding of how these
24    agreements work.  But whatever you say the
25    burden of proof is, it doesn't really matter.
```

1              Proceedings

2    Because if you have got clear and unambiguous

3    contract language, that satisfies any burden

4    of proof, however you want to define it.

5              Now, Enron did not list the EEC

6    Notes as being subject to the subordination

7    under the 1987 Indenture.  We did not

8    challenge that, so that is not an issue.

9              As to the TOPRS Indentures, Enron

10   did list the EEC Notes as being entitled to

11   the benefit of that subordination.  Baupost

12   initially objected, but then has withdrawn

13   its objection.  But it is important to see

14   what Baupost has said about that, because it

15   actually seriously contradicts what they have

16   said about the other Loan Agreements.

17             The TOPRS Indentures define "Senior

18   Indebtedness" as meaning "all

19   indebtedness" -- I am just going to skip over

20   the irrelevant words here -- "all

21   indebtedness ... evidenced by notes,

22   debentures, bonds or other securities sold by

23   the Company for money borrowed ..."

24             Now, we have produced evidence that

25   the Enron Equity Notes were notes for money

```
 1                    Proceedings
 2    borrowed, and that they were sold.  Baupost's
 3    counsel acknowledged during oral argument
 4    that there is nothing ambiguous about that
 5    language.  They acknowledged in the papers
 6    they filed, at paragraph 22 in their response
 7    that each EEC Claim is evidenced by a
 8    promissory note for money borrowed, that they
 9    were sold, and that they concede, therefore,
10    that they are entitled to the benefits of
11    subordination under the TOPRS Indentures.
12              Well, compare that to the language
13    in the 1993 and 1994 Loan Agreements where
14    Baupost is still challenging whether the EEC
15    notes are entitled to subordination.  The
16    TOPRS Indentures said "all indebtedness
17    evidenced by notes for money borrowed."  The
18    1993 and 1994 Loan Agreements say "all
19    indebtedness for money borrowed."  The only
20    difference is that the TOPRS Indentures
21    impose an additional requirement -- that
22    there be a note.
23              Now, if that language is
24    unambiguous and if the EEC Claims, admittedly
25    in Baupost's own view, are entitled to
```

```
 1                Proceedings
 2    subordination under that, I don't see how
 3    conceivably the fact that the word "notes"
 4    was dropped out in the 1993 and 1994 Loan
 5    Agreements could somehow create an ambiguity
 6    as to whether the EEC Claims are entitled to
 7    the benefits of that subordination.
 8                When Baupost argues that there is
 9    supposedly some ambiguity in the word
10    "indebtedness," there is no ambiguity in the
11    word "indebtedness."  What they are really
12    saying is they are not challenging so much
13    that this is a debt.  In fact, they admitted
14    for purposes of TOPRS Indentures that it is a
15    debt and that it is for money borrowed.  What
16    they are really saying is that they want to
17    argue to you that there is some ambiguity as
18    to whether some debts are excluded, not based
19    on whether they are debts, but on who holds
20    them.  In that regard they are not really
21    arguing that there is anything ambiguous
22    about the word "indebtedness."  They are
23    arguing that somehow there is something
24    ambiguous about the fact that the loan
25    agreements refer to "all indebtedness," and I
```

1                    Proceedings

2    submit to you that there is nothing ambiguous

3    about the word "all." All means all. If you

4    have got no exceptions that are listed, that

5    is what it means and you don't exclude any

6    indebtedness just because it is held by a

7    Subsidiary or by an affiliate.

8              The only argument that they have

9    made as to whether there is any ambiguity is

10   not based on any of the language of the

11   contracts, it is based only on this

12   prospectus, which in their view, because it

13   had a consolidated financial statement,

14   supposedly didn't include the EEC notes in

15   describing the debts that would constitute

16   indebtedness to which subordination would

17   apply. That is parol evidence that you

18   shouldn't even look to, because there is no

19   ambiguity in the contract. But not only

20   that, the EEC notes didn't even exist at the

21   time that prospectus was published. They

22   couldn't have been referred to and listed in

23   the prospectus, because they were executed in

24   two cases on December 30, 1994, and in one

25   case in 1996, which is after the two Loan

1              Proceedings

2    Agreements in question.  So how the

3    prospectus could possibly be interpreted as

4    saying anything about the treatment of those

5    notes is beyond me.

6              "Indebtedness" is a very simple

7    interpretation.  It is in the dictionary.  It

8    says, "Something, as an amount of money, that

9    is owed."  There is no ambiguity in that, and

10   I submit to you that their concession that we

11   are entitled to subordination under the TOPRS

12   Indentures ought to also end the question as

13   to the 1993 and 1994 Loan Agreements.

14             Thank you, Your Honor.

15             JUDGE GONZALEZ:  Thank you.

16             The next person?

17             MS. REID:  Good morning, Your

18   Honor.  Sarah Reid from Kelley Drye & Warren

19   appearing on behalf of JPMorgan Chase Bank,

20   NA, as agent for the certain financing

21   transactions known as Choctaw/Zephyrus and

22   the Syndicated Letter of Credit Facilities,

23   as well as appearing on its own behalf.

24             Your Honor, at the outset, I would

25   like to try just briefly to focus on the law

```
 1                  Proceedings
 2  which applies to Your Honor's analysis today
 3  in this intercreditor dispute.
 4            Amended Schedule S, which has been
 5  proposed by the Debtors, is an analysis of
 6  who is entitled to subordination, and who is
 7  not; what is senior debt, and what is not.
 8  Under 510(a) of the Bankruptcy Code, "Any
 9  analysis of a Subordination Agreement must be
10  interpreted purely by reference to state
11  law."  The law is well-settled in that
12  regard.
13            There has been, as I am sure Your
14  Honor is aware, litigation in this regard
15  both in the Eleventh Circuit and in the First
16  Circuit, culminating in the First Circuit in
17  the Bank of New England case of last year.
18            So there can be no reference to
19  anything, other than the state law, and state
20  law without reference to Bankruptcy Rules of
21  interpretation.
22            That I wanted to say at the outset,
23  and then I wanted to just briefly reiterate
24  the point made by John Hancock, that this is
25  not a case which is the normal case where a
```

```
 1              Proceedings
 2    junior creditor who is being subordinated is
 3    before the Court arguing that the
 4    subordination provision should not be
 5    applied.  This is a case where another in
 6    essence senior creditor is basically raising
 7    an argument essentially in order to avoid, as
 8    they would see it, some form of dilution.
 9    They are the only person before your Court.
10    There is no junior creditor who has come to
11    this argument today to raise the issue that
12    the subordination has been improperly applied
13    by the Debtors in their Amended Schedule S.
14              Turning to the rules of
15    construction that are going to govern Your
16    Honor's analysis, they are the normal
17    fundamental state law rules of construction.
18    These particular documents vary in terms of
19    which state law they refer to.  Some are New
20    York and some are Texas, but the basic rules
21    between the jurisdiction, I think, are all
22    the same.
23              The proper interpretation of an
24    unambiguous contract is a question of state
25    law for the Court, and in order to look to
```

```
 1                   Proceedings
 2    the contract, courts look to the plain
 3    meaning.  That includes looking at the
 4    dictionary, if needed, for the plain and
 5    ordinary meaning of the words in a contract.
 6    A Court may only look to the four corners of
 7    the contract.  It may not look outside of it.
 8    It may not look at other contracts or other
 9    extrinsic evidence in terms of its initial
10    analysis of the contract and what it means.
11                   Before looking to anything, a Court
12    must make a finding that a particular term is
13    ambiguous, and it is only at that point after
14    finding that any extrinsic evidence can be
15    introduced, and even then, extrinsic evidence
16    may not be introduced to rewrite the terms of
17    the contract, but only to explain the
18    judicially found ambiguity.  It is important,
19    because for purposes of today's argument, the
20    Court should disregard any citation to the
21    prospectuses or the 10Q that Baupost has
22    proffered.  That is extrinsic evidence.  It
23    is not properly before the Court at this
24    point in time and would only be proper if and
25    when the Court after consideration determines
```

1                    Proceedings
2    that some particular term is ambiguous.
3    Thus, Baupost's Exhibits E, F, I, J and K are
4    not properly before the Court at this point.
5                 Not that I think that anything is
6    ambiguous -- and I will get to that in a
7    moment -- but if the Court were to find
8    ambiguity, then under the learning from the
9    Bank of New England court and others,
10   basically you would have a period of
11   discovery where the parties would find
12   documents and take depositions in order to
13   attempt to determine what the correct meaning
14   of the term is.  You get into whole areas of
15   the law as to whether it has to be
16   objectively expressed intent versus intent
17   that was never expressed.  Most courts say
18   that you have to have it communicated at the
19   time.
20                 So you have a period where
21   discovery is taken, and then the Court has a
22   hearing.  The Court hears from whatever
23   witnesses there are, looks at the documents,
24   and then makes a determination.  As some of
25   the cases show, in the event that after all

1                    Proceedings

2    of that it turns out there is really nothing

3    very helpful there, the Court then has to go

4    back and decide it as a matter of law.  So

5    that is the kind of framework we are working

6    in at this point.

7              I will now turn to the merits of

8    each of the arguments that Baupost has

9    advanced.  Basically, the Court has to apply

10   a common sense meaning to the words, read

11   them as a whole, and make a determination as

12   to what was the purpose overall of the

13   particular provision.

14             I would like to do this, with Your

15   Honor's permission, claim by claim, because I

16   think it is easier and will ultimately go

17   faster.

18             So I would like to turn first to

19   the Cherokee Claim, which is claim number

20   1132, Exhibit B to our response to the

21   Objection.  That claim has been settled.  The

22   Settlement Agreement is also attached to our

23   Objection as Exhibit A.  It has been allowed.

24   It is a claim that is premised on Enron's

25   guaranty of an ENA Note, which was then

```
 1                    Proceedings
 2    assigned to JPMorgan, as agent for the
 3    Choctaw Lenders.
 4              Baupost had initially challenged
 5    the Cherokee Claim under the 1987 Indenture.
 6    It has withdrawn its objection, because it
 7    has conceded that Cherokee was a
 8    "Non-Controlled Subsidiary," as that terms is
 9    defined in the 1987 Indenture.
10              So we will come back to the 1987
11    Indenture with EFP.  I am going to contrast
12    that with Cherokee, but I just wanted to
13    bring that out at this point.
14              So basically we turn to the TOPRS
15    Indentures, which Baupost has annexed, and it
16    is Exhibits C and D's relevant language.  We
17    turn to the definition of a "Senior
18    Indebtedness," which is on page 6 of at least
19    the 1997 Indenture, and they are virtually
20    the same in both.
21              If you look at the definition of
22    "Senior Indebtedness" in the TOPRS
23    Indentures, it really is a very broad
24    definition when you read it as an entirety.
25    Senior Indebtedness means the principle of,
```

```
 1                    Proceedings
 2    premium, of any, and interest on and any
 3    other payment due pursuant to any of the
 4    following, whether outstanding now or
 5    hereafter created:   all indebtedness of the
 6    Company (other than for trade creditors)
 7    evidenced by notes, debentures, bonds, or
 8    other securities sold by the Company for
 9    money borrowed and capitalized lease
10    obligations.
11              Then it goes on and says, all
12    indebtedness of others of the kinds described
13    in the preceding clause (i) assumed or
14    guaranteed in any manner by the Company.
15    That is exactly our situation.  We have a
16    note, an ENA note, guaranteed by the Company.
17    It is clearly debt.   It is a note and it is
18    -- let me finish the definition -- not
19    explicitly subordinated by its terms.   That
20    is the final piece of the Senior Indebtedness
21    definition in TOPRS.
22              So, basically, the way this works
23    is, unless you are a trade creditor or unless
24    you were explicitly subordinated, your Senior
25    Indebtedness under the TOPRS' Senior
```

```
 1                    Proceedings
 2    Indebtedness definition.
 3              Now, to me, reading it as a whole,
 4    it couldn't be clearer what this indenture
 5    was trying to do.  But Baupost's argument is,
 6    as I understand it, as follows:  "No.  What
 7    this indenture really means is something much
 8    more limited."  They want to take this clause
 9    modifying "other securities," which says
10    "sold by the Company" and apply it back to
11    notes and debentures and make a requirement
12    that a note or a debenture has to be sold.
13    This is a non-plain, twisted meaning.  Notes
14    and debentures are clearly for money
15    borrowed.  They are clearly debt.  It is
16    completely atypical in any indenture to
17    require that they would be sold as some
18    element of Senior Indebtedness.  That is not
19    something that is ordinary, at least that I
20    have seen, and I think Mr. Winston said he
21    hadn't seen it either.
22              I would point out to Your Honor, it
23    really makes no sense, because, apparently,
24    if you take their meaning of "sold by the
25    Company," notes, debentures, and bonds have
```

```
 1              Proceedings
 2   to be sold by the Company and the capitalized
 3   lease obligations wouldn't.  It makes no
 4   sense because in the case of other
 5   securities, you can have an instance -- in
 6   fact, many instances -- where they are not
 7   sold for money borrowed.  They are sold as
 8   equity.  They are sold as common stock.  They
 9   are sold as preferred.  So what this is
10   attempting to do is capture debt, but not
11   capture any kind of an equity security
12   interest.
13             I wanted to point out, because this
14   issue really was I think most fully briefed
15   by Baupost in its reply to which we had not
16   filed a written response, that the ruling
17   enunciated makes sense under the basic rules
18   of contract construction and the rules of
19   grammar, namely what is called the "last
20   antecedent rule," which is simply put
21   "ordinarily qualifying phrases are to be
22   applied to the words immediately preceding
23   and not extending to ones or to others more
24   remote within the phrase."
25             I just cite, Your Honor, to one
```

1                    Proceedings

2    case in this regard, and that, in turn, will

3    cite you to others.  It is Groupo Condumex v.

4    SPX Corp., 163 F.Supp.2d 857 at 861.  It is a

5    federal case from the Northern District of

6    Ohio.  There are other cases like that, but I

7    thought that one was particularly helpful in

8    terms of its talking to the fact that you

9    have to look at what makes sense within the

10   clause and that ordinarily you look to what

11   is immediately preceding, rather than try and

12   import it back to more remote phrases.

13            The other point that Baupost has

14   made with regard to Cherokee references to

15   the various prospectuses.  As I have already

16   pointed out, that is extrinsic evidence.  It

17   is not properly before the Court.  The Court

18   would have to make a finding that the

19   definition of "Senior Indebtedness" is

20   somehow ambiguous before any such evidence

21   would be proffered, and then it could only be

22   proffered in the context of a hearing.

23            These prospectuses speak to

24   nothing.  This debt wasn't incurred.  There

25   is no way of knowing what would or wouldn't

```
 1                    Proceedings
 2    have been entered on the financial statements
 3    and what probative value it would have.  It
 4    is just simply not an appropriate citation or
 5    evidence for the Court to consider at this
 6    point in the proceedings.
 7              Let me turn briefly in terms of the
 8    Cherokee Claims to the 1993 and 1994 Loan
 9    Agreements.  Again, the term here is
10    extremely broad and even, I think, the
11    broadest of all of the ones that we are
12    looking at.  The term "Senior Indebtedness"
13    means the principal, premium, and interest on
14    all indebtedness of Enron, whether
15    outstanding at the date hereof or hereafter
16    created for money borrowed or evidenced by a
17    note or similar instrument.  Then it goes on,
18    any indebtedness of others of the kinds
19    described above, payment for which Enron is
20    responsible, as a guarantor.
21              The Cherokee Claim falls squarely
22    under this definition.  It is Enron's
23    guaranty of a note and, as such, it could not
24    be clearer that it has properly been
25    classified as Senior Indebtedness.
```

1            Proceedings

2            Baupost's argument that because

3    there is no definition of the word

4    "indebtedness", it must necessarily be

5    ambiguous, I think, would stand contract

6    interpretation on its head.  Many contracts

7    have words used.  We all understand what they

8    mean.  "Indebtedness" means money owing.  It

9    is a debt of some sort.  This particular,

10   very broad definition makes it clear that it

11   is trying to encompass as much debt as

12   possible.  There is nothing that this Court

13   could or should do in making any kind of

14   finding that this is anything other than

15   ambiguous.  You can imagine what the hearing

16   would be like on what is indebtedness in

17   general?  This is not a term that Your Honor

18   needs evidence on in order to reach its plain

19   and undisputed meaning.

20            So under all of these

21   circumstances, the Court need look no

22   further.  The Cherokee Claim was properly

23   included on Amended Scheduled S.

24            I would like to turn now to claim

25   number 1126.  That is Exhibit C to our paper.

```
 1                    Proceedings
 2  That is the EFP Claims, Class 185 and Class
 3  4.  The Class 185 claim is like Cherokee -- a
 4  claim based on Enron's guaranty of an ENA
 5  note.  The Class 4 is a direct claim against
 6  Enron through a Demand Promissory Note.  Both
 7  are, again, assigned to JPMC, as agent for
 8  the Zephyrus Lenders.
 9                In this case, let's start with the
10  1987 Indenture, and I just want to go to the
11  way the 1987 Indenture is set up.  It, unlike
12  the TOPRS Indentures, has a definition of
13  "Senior Indebtedness" and a definition of
14  "indebtedness" itself.
15                Basically the Baupost argument is
16  not that these claims do not meet the
17  definitions of "Senior Indebtedness" and
18  "indebtedness," but what they basically argue
19  is that you have to carve out what would
20  otherwise be properly classified as senior
21  debt, because it is held allegedly by a
22  Subsidiary.  That exception is in the "Senior
23  Indebtedness" definition at the very end,
24  where it says that indebtedness of a Company
25  to a "Subsidiary" defined term is excluded.
```

1              Proceedings

2              Baupost's argument with regard to

3    this starts with the premise that the Court

4    has to ignore the indenture's own definition

5    of "Subsidiary" and "corporation."  I just

6    want to read those to you.  I should say at

7    the outset, EFP is not a corporation.

8    Everybody agrees to that.  It is a limited

9    liability company.  So it is not, unlike

10   Cherokee, a corporation.

11             The definition of "Subsidiary" says

12   "Subsidiary" means a corporation all of the

13   voting shares ... of which shall be owned by

14   the Company or by one or more Subsidiaries."

15   It basically explicitly references that you

16   have to exclude shares "entitled to vote only

17   upon the happening of some contingency unless

18   such contingency shall have happened.

19   Everybody agrees that the contingency did

20   happen."  EFP was not controlled by Enron

21   from the point of the petition through the

22   settlement.  I think the only dispute on that

23   occurs at the point that you actually have

24   distribution.

25             The point that Baupost doesn't

```
 1                    Proceedings
 2     raise to Your Honor, and which I think is
 3     interesting, page 3 of the indenture defines
 4     what a corporation includes, and it says:  "A
 5     corporation includes corporations, voluntary
 6     associations, joint stock companies, and
 7     business trusts."  So that is it.  It doesn't
 8     include limited liability companies.  This
 9     exclusion doesn't apply.  There is no need to
10     take evidence or look into anything further.
11     There is nothing ambiguous about this.  You
12     have basically the Senior Indebtedness
13     exclusion.  It refers to what a Subsidiary
14     is.  It says a Subsidiary means a
15     corporation, and the indenture tells you what
16     a corporation is.  EFP is not a corporation
17     and, accordingly, that should be the end of
18     the inquiry.
19              Now, I will just take a moment on
20     it, because I really do think the document is
21     so clear that we don't need to spend a lot of
22     time on it.  But basically Baupost's argument
23     is:  "Look, we want this Court to ignore the
24     fact that EFP is not a corporation and
25     pretend it is a corporation for purposes of
```

```
 1                    Proceedings
 2     this analysis, and now we want to say that as
 3     a result of the settlement in the
 4     Choctaw/Zephyrus case, where we concede
 5     Choctaw, which really was a corporation,
 6     continues and is entitled to the benefit of
 7     Senior Indebtedness, even though there was
 8     this settlement, now we want to say because
 9     EFP had a different corporate form and ended
10     up redeeming its shares, somehow that means
11     it is now disqualified and it should no
12     longer be allowed to have Senior
13     Indebtedness."  It is an Alice in Wonderland
14     argument, because it is basically asking the
15     Court to ignore the indenture's own structure
16     and pretend it is a corporation when it is to
17     Baupost's benefit.  Then when, all of a
18     sudden, you get to the point and you say,
19     "Well, because it is a limited liability
20     company and because we had to deal with it
21     differently in order to effect the same
22     result that we effected in Cherokee, now
23     suddenly it is not entitled to be a senior
24     listed on Amended Schedule S."
25                    That is clearly not what anybody
```

```
 1                  Proceedings
 2    thought or intended with the settlement.  The
 3    Court doesn't need to get into all of it,
 4    because, frankly, the indenture just could
 5    not be clearer that EFP does not fall within
 6    that Subsidiary exclusion.
 7                  Let me just briefly talk about
 8    Claim 4 of EFP, which Mr. Winston mentioned.
 9    The ECIC Note, which was the direct
10    obligation of Enron, was part of an
11    integrated financing transaction that
12    occurred all on the same day.  The note was
13    entered into and immediately assigned to EFP
14    where it was held and listed as credit
15    protection for the Zephyrus entities.  The
16    reason it was contributed was as credit
17    protection.  It has been filed and
18    prosecuted, as EFP was the holder.  At this
19    point to now argue that it is really ECIC's
20    obligation and that that somehow makes it
21    subject to the exclusion ignores the reality
22    that this is debt.  It was security.  It was
23    credit protection.  It was part of a
24    simultaneous financing.  It has been filed as
25    part of EFP's proof of claim.  It has been
```

1                    Proceedings

2    allowed as such, and the whole way the

3    bankruptcy has dealt with this has been as an

4    EFP claim.

5                    Just briefly, we turn to the TOPRS

6    Indentures.  The analysis is the same as what

7    I have already gone through with Your Honor

8    on Cherokee.  EFP Class 185 has a note

9    guaranteed by Enron, clearly Senior

10   Indebtedness.  There is no requirement.  It

11   has to be sold, under the terms of the

12   definition of "Senior Indebtedness."  It

13   basically is clearly debt which is entitled

14   to such classification.  EFP Class 4 is a

15   direct note against Enron and it falls under

16   the first part of the definition and,

17   accordingly, is clearly senior debt under the

18   TOPRS Indentures.

19                    In 1993 and 1994, again, the same

20   analysis as what I went through with

21   Cherokee.  Given the very broad definition,

22   you either have a direct obligation in clause

23   1 of the EFP 4 Claim or you have a guaranty,

24   similar to Cherokee, with the EFP 185 Claim.

25                    Let me turn finally to the Letter

1               Proceedings

2   of Credit Claims.  Baupost makes no argument

3   that vis-a-vis the 1993 and 1994 Loan

4   Agreements that these are not senior and

5   essentially concedes that they are.  It is

6   only vis-a-vis the 1987 Indenture and the

7   TOPRS Indentures that they make an argument.

8               At the outset, I just want to

9   briefly talk about what a reimbursement

10  agreement is.  It is annexed to our lengthy

11  and bulky Objection.  At Exhibit G is the

12  Letter of Credit Reimbursement Agreement in

13  the amount of $500 million, May 14, 2001.

14  Exhibit H is the Master Letter of Credit and

15  Reimbursement Agreement, as of June 16, 1995.

16              It is interesting that both of

17  these Reimbursement Agreements are a direct

18  obligation between Enron Corporation and the

19  Bank, as agent -- that is in Exhibit G,

20  because it was a syndicated facility -- or

21  just the Bank alone under the Bilateral

22  Master Agreement.

23              A Reimbursement Agreement is a

24  direct contractual obligation of Enron and is

25  similar to a revolving credit line.  It is